# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8024 | **DATE** | 2/4/2004 |
| **CASE TITLE** | Daniel Lutter vs. Rinella Beverage Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Rinella Beverage's Motion For Summary Judgment Against Lutter (Doc. #24)

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendant Rinella Beverage's Motion for Summary Judgment [#24] *is granted*. Enter Memorandum and Opinion. All pending dates and motions are terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | FEB 5 | date docketed | |
| ✓ | Docketing to mail notices. | | | 42 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| JHC | courtroom deputy's initials | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
04 FEB -4 PM 7: 10

Date/time received in central Clerk's Office

DOCKETED

FEB 5 - 2004

DANIEL LUTTER )
      Plaintiff, )
       )
v. )
       )
RINELLA BEVERAGE COMPANY )
      Defendant. )

Case No. 00 C 8024 **FEB 5** 2004

Judge William J. Hibbler

Magistrate Judge Ashman

## MEMORANDUM OPINION AND ORDER

Plaintiff, Daniel Lutter, worked for Defendant, Rinella Beverage Company ("RBC"), since 1983. Sam Rinella ("Rinella") is part owner, general manager, and president of RBC. On July 18, 1998, Lutter injured his back while working as a route truck driver ("RTD") for RBC. For the next 16 months, Lutter alternated between being off work, working as an RTD, and working in the RBC warehouse. In November 1999, RBC terminated Lutter's warehouse position. On December 21, 2000, Lutter filed suit against RBC alleging: (1) discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) failure to accommodate in violation of the ADA; and (3) retaliatory discharge under Illinois law. On April 4, 2003, RBC filed a motion for summary judgment against Lutter on each of his claims. This Memorandum Opinion and Order addresses the pending summary judgment motion.

## I. Factual Background

As an RTD, Lutter's primary responsibilities included distributing draft, canned and bottled

beer to RBC customers. RBC's drivers were required to unload beer from their trucks and stock beverages at the customer location. After Lutter injured his back on July 18, 1998, he continued to work as an RTD until July 28, 1998, at which time he missed two days of work, returned briefly, but then requested medical treatment due to the pain. Rinella made arrangements for Lutter to be seen by Rinella's family chiropractor, Dr. Jeff Arnold. In early August, Lutter sought treatment from Dr. Arnold. Dr. Arnold found that Lutter was able to return to work in a position that did not require any lifting, bending or twisting. RBC did not have any suitable positions available for Lutter and placed him on a leave of absence. On August 27, 1998, Rinella arranged for Dr. David Zoellick, an orthopedic surgeon, to examine Lutter. Dr. Zoellick ordered that Lutter perform no work until an MRI could be performed. Dr. Zoellick saw Lutter again on September 8, 1998, and, after an MRI, diagnosed Lutter with lumbar disc bulge. Dr. Zoellick restricted Lutter's work to a sitting job. Lutter remained on medical leave of absence because RBC had no sitting jobs available. At this time, both Lutter's and RBC's goal was for Lutter to return to his RTD position.

Rinella reported Lutter's injury to his workers' compensation insurance carrier three weeks after the injury. In September 1998, Lutter hired a workers' compensation attorney, George Tamvakis, to pursue a workers' compensation claim, and on September 17, 1998, Lutter filed an Application for Adjustment of Claim seeking workers' compensation benefits. Rinella was served with the Application soon after. Lutter claims that Rinella was upset with Lutter's decision to hire an attorney, but that after September 1998, Rinella and Lutter never again discussed the issue of Lutter's hiring of the attorney.

On October 6, 1998, Dr. Zoellick again restricted Lutter to a sitting job, and Lutter hand delivered Dr. Zoellick's medical diagnosis to Rinella. On that day, Rinella gave Lutter a note stating

that he wished for Lutter to return to work and that he "can accommodate light duty that limits lifting / warehouse work." On October 20, 1998, Dr. Zoellick released Lutter to work with a 25 pound lifting restriction and ordered no repetitive bending, lifting, kneeling, stooping, climbing, or squatting. These restrictions prevented Lutter from performing the duties of RTD. Dr. Zoellick specified that Lutter could drive and operate an electric mule. On that same day, RBC placed Lutter in a warehouse position, where Lutter began working 40 hours per week. Lutter was paid the warehouse scale set by his union's collective bargaining agreement ("CBA"). The CBA also stated that an RTD who was asked to perform duties in the warehouse would be paid one and one-half times the normal warehouse pay.

RBC does not maintain a written job description or task list for the warehouse position, but warehouse employees work together to perform what needs to be done around the warehouse, and they are not given specific assignments each day. The tasks performed by employees in RBC's warehouse include building and stacking pallets, loading pallets on trucks, replacing broken product with undamaged product, removing debris from the warehouse floor, performing "drop truck" deliveries, and shrink wrapping pallets. At the time Lutter worked in the warehouse, there were at least three employees permanently assigned to working in the warehouse, including: (1) Ed Markauskas, who moved to a warehouse job in 1989 as a result of an on-the-job back injury, from which he continues to experience pain while working; (2) Bob Harwood, who moved from being an RTD to a permanent warehouse employee after he requested less physically demanding work; and (3) Kevin Swanson, who also moved to the position of warehouse employee after requesting less physically demanding work.

On November 10, 1998, Dr. Zoellick decreased Lutter's weight lifting restrictions, permitting

3

him to lift 50 pounds with no repetitive bending, stooping, lifting, kneeling or squatting. These restrictions were maintained at Lutter's December 8, 1998, check-up. On December 21, 1998, Jay Levin, Dr. Zoellick's associate, found no role for surgical treatment. On January 12, 1999, Lutter informed Dr. Zoellick that he wanted to return to his position as an RTD. After an examination, the doctor found Lutter's condition to be improving and released him to full duty work. On January 21, 1999, RBC assigned Lutter a helper to assist with Lutter's transition back to his job. However, by January 24, 1999, Lutter felt unable to perform the duties of an RTD even with a helper. Dr. Zoellick referred Lutter to Dr. Lanoff, another chiropractor working with Lutter. At Dr. Lanoff's request, RBC placed Lutter on a leave of absence from January 25 through March 1, 1999. On February 6, 1999, RBC reassigned Lutter's truck driving route to another person pursuant to RBC's collective bargaining agreement. However, as of February 1999, the goal of RBC and Lutter remained to return Lutter to an RTD position.

On March, 2, 1999, Dr. Lanoff found that Lutter's subjective complaints of pain were out of proportion to his objective findings, and Dr. Lanoff saw no disability. Dr. Lanoff released Lutter to full duty work without restrictions. At that point, Rinella told Lutter to report to the warehouse. On March 17, 1999, Rinella issued a written warning to Lutter for insubordination because Lutter refused to work with a certain warehouse employee, Chuck Krueger, after Lutter's supervisor, Bill Kruse, assigned Lutter to do so. Rinella warned Lutter to stop badmouthing the organization, and stated that the warning would stay in place for six months and any new problems would result in a two day suspension. On April 29, 1999, Lutter independently sought a neurosurgical consultation with Dr. Marshall Pederson because his pain was continuing while he was performing his warehouse assignments at RBC.

On July 7, 1999, Lutter also underwent an independent medical examination by Dr. Matthew Ross. Dr. Ross sent a letter to RBC's workers' compensation company stating that it is unlikely Lutter would be able to return to full duty work with or without surgery and that Lutter's prognosis for further improvement is only fair. On July 9, 1999, Lutter reported to Dr. Pederson that he had difficulty performing repetitive bending and twisting and excessive heavy lifting, but that he could participate in light-duty employment. Dr. Pedersen described this in a letter to Donna Bondi, a registered nurse hired by RBC's workers' compensation insurance carrier to assist with Lutter's return to an RTD position. Dr. Pederson restricted Lutter to lifting a maximum of 25 to 30 pounds and avoiding repetitive bending and twisting of his back. Dr. Pedersen wrote that Lutter indicated that he was able to drive a drop truck but that he could not handle the individual beverages. Dr. Pedersen wanted to postpone surgery. In July 1999, Ms. Bondi concluded that Lutter's prognosis for recover was excellent and that he would be able to return to full duties. At this time, both Lutter and RBC still preferred Lutter to return to an RTD position. In fact, Rinella informed Lutter that RBC was trying to get Lutter back to full duty by getting him medical treatment and other assistance.

On September 28, 1999, Lutter completed a medical history form for Dr. Pederson, in which he indicated that he experienced pain performing light duty work as well as his usual work because he had a difficult time bending, twisting and lifting; but that he worked through the pain. At this point, Dr. Pederson recommended surgery because Lutter was having increasing pain bending, twisting, sitting for long periods of time, standing for long periods of time, and lifting. Pedersen sent a letter to the insurance carrier on October 1, 1999, explaining his diagnosis. In October 1999, Lutter also reported to Bondi that he was experiencing increasing pain while performing his duties in the warehouse, and he told Rinella that he would never be able to return to the RTD position unless he

5

had a helper.

On October 15, 1999, RBC's insurance company and Lutter's attorney resumed discussions of possible resolution of Lutter's workers' compensation claim. On November 11, 1999, Rinella had a conversation with his workers' compensation attorney where Rinella told the attorney that the union would not cooperate with a settlement that called for payment of pension benefits to Lutter. Rinella's attorney gave Rinella the impression that Lutter's workers' compensation claim would not settle anytime soon. The parties did not settle the claim, and on November 12, 1999, Rinella terminated Lutter's warehouse position. Rinella would have allowed Lutter to remain employed at RBC only if Lutter performed his RTD position without any restrictions. RBC stopped paying Lutter's medical bills at this time, and Lutter received no further workers' compensation benefits from RBC. RBC continued to pay health and welfare and pension benefits on Lutter's behalf through July 2000, pursuant to the collective bargaining agreement with Lutter's union. After failing to find employment as a driver at 11 different companies, Lutter secured employment performing light mechanical work at Four Winds Golf Course. Lutter's workers' compensation claim is still pending.

## II.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). The

6

initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 91 L. Ed. 2d 265 (1986); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497 (7th Cir. 1998). A question of material fact is a question which will be outcome determinative of an issue in the case. *Anderson*, 477 U.S. at 248.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Id.* A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The non-moving party cannot create an issue of fact with speculation or conjecture. *Borcky v. Maytag*, 248 F.3d 691, 695 (7th Cir. 2001). During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996).

## III. ADA Claims

The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, two distinct categories of disability discrimination claims exist: failure to accommodate and disparate treatment. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999) (citing *Sieberns v. Wal- Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997)). The ADA defines discrimination as including:

(1) limiting, segregating, or classifying a job applicant or employee in a way that

7

adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C.A. § 12112(b). Lutter asserts a cause of action under both categories of disability discrimination: (1) wrongful termination (that Lutter was terminated because of his disability); and (2) failure to provide reasonable accommodation for Lutter's disability.

Any claim for discrimination under the ADA requires a showing that Lutter was a qualified individual with a disability. 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means:

[A]n individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(b)(8). The Court will deal first with whether Lutter is disabled, and second, whether, with or without reasonable accommodation, he can perform the essential functions of the employment position that he holds or desires.

### A.     Is Lutter Disabled Under The ADA?

The ADA defines disability in three separate ways: (1) a physical or mental impairment that

8

substantially limits one or more major life activities; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C.§12102(2); *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002). Lutter claims that he is disabled because he has a physical impairment that substantially limits one or more major life activities, and, in the alternative, that RBC regarded him as having such an impairment, even if he did not, in fact, have one.

Major life activities refer to the activities that are of central importance to an individual's daily life. *Toyota,* 534 U.S. at 197. Federal regulations have named "performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working" as tasks that qualify as major life activities. 29 C.F.R. §1630(i). A person is substantially limited when he is "either unable to perform, or significantly restricted as to the condition, manner, or duration under which the individual can perform, a major life activity as compared to an average person in the general population." 29 C.F.R. § 1630.2(j); *Sears*, 233 F.3d at 438. Factors to be considered by a court in determining whether an impairment results in a substantial limitation on a major life activity are: (1) the nature and severity of the impairment; (2) the actual or expected duration of the impairment; and (3) the anticipated or actual permanent or long-term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

Lutter maintains that he is substantially limited in his ability "to maintain an active lifestyle, to walk, to run, perform manual tasks, move about and/or perform any job requiring repetitive manual labor or heavy physical exertion." Lutter, however, has provided no evidence that maintaining an active lifestyle or running are of central importance to an individual's daily life, and this Court has found no cases suggesting as much. Moreover, Lutter has provided no evidence that he is "substantially limited" in his ability to walk or move about. In fact, Lutter has provided no

9

evidence that his ability to walk is limited in any way. Based on this lack of evidence, the Court finds that Lutter's allegations that he was substantially limited in his ability to walk, run, move about, and maintain an active lifestyle could not reasonably amount to a disability.

Lutter also does not provide sufficient evidence that he is substantially limited in performing manual tasks. The Supreme Court has explained that "manual tasks unique to any particular job are not necessarily important parts of most people's lives." *Toyota*, 534 U.S. at 201. In *Toyota*, the plaintiff's inability to perform repetitive work with hands and arms extended at or above shoulder levels for extended periods of time was found to be job-specific, not a manual task that was an important part of most people's daily lives. *Id.* In contrast, the Supreme Court held that household chores, bathing, and brushing one's teeth were among the types of manual tasks of central importance to people's daily lives. *Id.* at 201-02. The maximum restrictions placed on Lutter by his doctors at any time were to avoid repetitive bending and twisting, to avoid standing for long periods of time, and to avoid lifting more than 25 pounds. These limitations do not come close to the manual tasks described by the Supreme Court as having central importance to people's lives. Therefore, this Court finds that Lutter has not provided any evidence from which a jury could reasonably determine that he was disabled by reason of an alleged inability to perform manual tasks.

Lutter also argues that he has enough evidence to prove that his back condition prevents him from performing any job requiring repetitive manual labor or heavy physical exertion, and that he is thus substantially limited in the major life activity of working. Specifically, Lutter claims that he is not able to work: (1) in factory positions requiring manual labor; (2) in retail sales; or (3) as a cashier at a store counter. When the major life activity is that of working, the plaintiff must show that he is significantly restricted in the ability to perform either a class of jobs or a broad range of

jobs in various classes as compared to the average person having comparable training, skill, and abilities. 29 U.S.C. § 1630.2(j)(3)(i). The Seventh Circuit has held this to mean that the plaintiff must provide some evidence of the "numbers and types of jobs" within the geographical area to which the plaintiff had reasonable access, and the number of jobs from which he was precluded because of his impairment. *E.E.O.C. v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1017 (7th Cir. 2001). "[A]n inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Skorup v. Modern Door Corp.*, 153 F.3d 512, 514-15 (7th Cir. 1998) (citing *Weiler v. Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir. 1996)).

RBC claims that Lutter has not provided the necessary evidence of the numbers and types of jobs from which he was precluded, and that Lutter's alleged impairment only limits his ability to perform truck driving and other specific duties for RBC. Indeed, Lutter has not provided specific evidence of the numbers and types of jobs from which he was precluded because of his alleged impairment. Lutter testified that between November 1999 and May 2000, he looked for employment as a truck driver with 11 companies but was not offered employment with any of those companies. In addition, Lutter has evidence that at various times since his injury, including from July 1999 through the date of his termination, his doctors restricted him from lifting over 25 to 30 pounds and ordered him to avoid repetitive bending and twisting of his back.

Lutter asserts that the lack of demographic evidence is not fatal to his claim. In *Rockwell*, the Seventh Circuit declined to create a *per se* rule that a plaintiff cannot prevail on a disability discrimination claim without quantitative evidence of the precise characteristics of the local job market. *Rockwell*, 243 F.3d at 1017. Moreover, the factors set out in § 1630.2(j)(3)(ii) "are not

intended to require an onerous evidentiary showing. Rather, the terms only require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment." 29 C.F.R. Pt. 1630, App. § 1630.2(j). The Seventh Circuit held that this requires "at least some evidence from which one might infer that [the claimants] faced 'significant restrictions' in [their] ability to meet the requirements of other jobs." *Rockwell*, 243 F.3d at 1018 (citing *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998)). In *Rockwell* the court held that the plaintiffs did not provide sufficient evidence that the plaintiffs' alleged impairment, a perceived inability to perform jobs requiring frequent repetition or use of vibratory power tools, foreclosed them from more than their specific jobs. Therefore, the Seventh Circuit affirmed summary judgment against the plaintiffs. *Rockwell*, 243 F.3d at 1017-18.

Similarly, in *Skorup*, the Seventh Circuit affirmed summary judgment against the plaintiff where she asserted in her brief that she could not perform any and all jobs which required repetitive stretching and pulling of the shoulder, but provided no evidence of the number of jobs from which she was precluded because of this impairment. *Skorup*, 153 F.3d at 515. The Seventh Circuit held that "[t]o establish that the ADA applies to her condition, [the plaintiff] needed to identify what requirements posed by the class of assembly line jobs (or, alternatively, by a broad range of other jobs) were problematic in light of the limitations her fibromyalgia imposed upon her." *Id*. The court affirmed summary judgment against the plaintiff because she failed to set forth evidence from which the court could determine even "general guideposts, such as whether her impairment forecloses her from accepting a few, many, or most of the jobs in a particular class or in a broad range of classes." *Id*. Likewise, the Seventh Circuit held in *Davidson* that the plaintiff had come forward with no

12

evidence from which a jury might reasonably infer that ADD precluded her from holding other comparable positions as a therapist. *Davidson*, 133 F.3d at 506-07. The plaintiff argued that she was discharged because her ADD made her unable to dictate her notes; however, the plaintiff made no showing that this is a skill that other counseling positions require. *Id.*

Lutter argues, however, that his back injury is such an obvious impediment to his ability to perform a certain range of jobs that he does not need to present evidence of the numbers and types of jobs from which he is foreclosed. Evidence of the number and types of other jobs from which a plaintiff is foreclosed may not be necessary if his is "one of the rare cases in which the claimants' impairments are so severe that their substantial foreclosure from the job market is obvious." *Rockwell*, 243 F.3d at 1017-18. The Appendix to the Code of Federal Regulations states that: "An individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs." 29 C.F.R. Part 1630 Appendix § 1630.2(j). Thus, the Code of Federal Regulations assumes that a back injury may sufficiently prove a substantial limitation in the major life activity of working if the individual is prevented from performing heavy labor jobs, as Lutter alleges he is.

In addition, in at least three cases, the Seventh Circuit has found that plaintiffs had produced enough evidence to survive summary judgment on the issue of whether they were disabled under the ADA because of their substantial limitations in the major life activity of working, when the plaintiffs' only evidence was certain physician-ordered restrictions placed on the plaintiffs and their doctors' recommendations concerning how their respective injuries would affect their ability to

obtain other employment.[1] In *DePaoli v. Abbott Lab.s*, 140 F.3d 668 (7th Cir. 1998), the Seventh

Circuit held that the plaintiff had presented sufficient evidence from which a jury could find that her

hand injury – tendinitis and tenosynovitis – prevented her from performing more than just her Abbott

production line job. The court cited to two doctors' reports that agreed that the plaintiff had become

disabled from performing virtually any employment that required repetitive motions of her right

hand. *Id*. at 673. In *DePaoli*, the hand was usable for less strenuous work, and the doctors saw no

need to impose a weight lifting restriction on the plaintiff. Nevertheless, the court still found that

the doctors' opinions indicated that the plaintiff was precluded from a wide group of jobs in the

Chicago area economy: virtually any assembly line job that required repetitive movement. *Id*. (citing

to 29 C.F.R. Part 1630 Appendix § 1630.2(j), which states that a back condition that prevents an

individual from performing any heavy labor job would substantially limit the individual in the major

life activity of working).

Similarly, in *Best v. Shell Oil Co.*, 107 F.3d 544 (7th Cir. 1997), the Seventh Circuit held that

the plaintiff had presented enough evidence to survive summary judgment where the doctor's advice

that the plaintiff should "find another line of work" due to his knee injury showed that his disability

might preclude him from all truck drivers' jobs, not just the job he had done for Shell. *Id*. at 548.

In *Best*, the employer had refused to accommodate the plaintiff truck driver's impaired knee by

giving him a truck with sufficient leg room to avoid the need to flex his knee beyond a 90-degree

---

[1]The Seventh Circuit has also found this evidence sufficient to survive summary
judgment when the major life activity was walking. In *Sears*, 233 F.3d at 438-39, the employee's
primary evidence as to her disability was her doctors' diagnoses stating that she had an
impairment that required that she limit her walking. The court held that on the basis of the
testimony of both the employee and her physicians, the plaintiffs met their burden of establishing
a material dispute as to the severity of the employee's impairment. *Id*.

position. The record did not show how many truck driving jobs required the ability to operate a truck with a clutch or how often the configuration of the Peterbilt seat, painful to the plaintiff, occurred. Nevertheless, the court found that the statements from the plaintiff's doctor and another witness were sufficient to raise an issue of fact as to whether the plaintiff would be precluded from all truck driving jobs.

In addition, in *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908 (7th Cir. 1996), the Seventh Circuit held that the nature of plaintiff's shoulder injury was sufficient for a reasonable jury to conclude that the plaintiff would be disqualified from a broad range of jobs. *Id.* at 911. The court looked at the physical restrictions the plaintiff's physician placed upon him – no overhead work, heavy lifting, or pulling and pushing out from his body, and held that a reasonable jury may find that those restrictions apply to a broad range of jobs. *Id.* The court stated: "As with the example of the bad back in the regulations, Cochrum's shoulder injury could disqualify him from any position at the mine, or in related work such as construction. Given the breadth of his physician's physical restrictions, a reasonable jury could conclude that Cochrum's shoulder impairment does substantially limit his ability to work." *Id.*

In two other Seventh Circuit cases, however, the Seventh Circuit held that evidence of doctors' restrictions as to lifting and other non-numerical evidence was not sufficient to show that a back and shoulder injury limited the plaintiffs' ability to engage in a class of jobs. In *Contreras v. Suncast Corp.*, 237 F.3d 756 (7th Cir. 2001), the plaintiff claimed that he was substantially limited in the major life activity of working because he was unable to lift in excess of 45 pounds for a long period of time, unable to engage in strenuous work, and unable to drive a forklift for more than four hours a day. *Id.* at 763. The court, however, held that such inabilities failed to constitute a

significant restriction on one's capacity to work under the ADA. *Id.* Similarly, in *Peters v. City of Mauston*, 311 F.3d 835 (7th Cir. 2002), the plaintiff only presented evidence of his physician-imposed restrictions, which included a 50-pound lifting prohibition. *Id.* 843-44. The Seventh Circuit held this evidence insufficient to survive summary judgment. *Id.*

In the case at bar, Lutter's physician-imposed restrictions were substantially more extensive than a 45 to 50 pound lifting restriction. Lutter was prohibited from lifting more than 25 pounds, and he was restricted from repetitive bending and twisting, as well as standing for long periods of times. Lutter has presented evidence similar to that presented in *Cochrum*, *Best*, and *DePaoli*, and the Seventh Circuit held that with such evidence a reasonable jury may find a plaintiff was precluded from performing the class of heavy labor jobs. Although Lutter has presented no evidence that he would be unable to work in retail sales or as a cashier at a store counter, Lutter has presented sufficient evidence from which a reasonable jury could find that Lutter is substantially limited in the major life activity of working in "factory positions requiring manual labor."[2]

## B.    Is Lutter A Qualified Individual Under The ADA?

Once an ADA claimant has established that he or she is disabled, the claimant must also show that he or she is a qualified individual. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). The plaintiff bears the burden of proof to show he is a "qualified individual." *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995).

---

[2]Because the Court finds that Lutter was disabled, the Court need not reach the issue of whether RBC regarded Lutter as having such an impairment.

### 1. Route Truck Driver Position

Lutter and RBC do not dispute that Lutter could not perform the essential functions of route truck driver at the time Lutter was terminated. Like the plaintiff in *Cochrum*, Lutter told Rinella repeatedly that given his doctors' restrictions, he was unable to perform the job of route truck driver. *Cochrum*, 102 F.3d at 912. Although Lutter suggests that he may be able to perform the job of RTD with a helper, this would be tantamount to reallocating the primary duties of the route truck driving job, and an employer "is not required to reallocate essential functions." 29 C.F.R. ¶ 1630.2(o). *See also Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001); *Cochrum*, 102 F.3d at 912 (citing *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991) (employee's request to assign coworkers to assist with physically demanding aspects of job employee could no longer perform was not request for reasonable accommodation because it sought elimination of essential functions of job)).

### 2. Warehouse Position

Nevertheless, Lutter claims that he was able to perform the essential functions of the job with reasonable accommodation. The reasonable accommodation Lutter sought was a permanent transfer to a warehouse position at RBC. The term "reasonable accommodation" may include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C.A. § 12111(9)(B). An accommodation is not reasonable, however, if it would "impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C.A. § 12112(b). "Undue hardship" is defined as an "action requiring significant difficulty or expense" when considered in light of the nature and cost of the

accommodation required, and the overall financial resources and structure of the employer. 42 U.S.C.A. § 12111(10)(A-B).

The ADA requires an employer to consider reassigning a disabled employee to a different, vacant position as a reasonable accommodation where the employee can no longer perform the essential functions of their current position. *DePaoli*, 140 F.3d at 675; 42 U.S.C. § 12111(9)(B); 29 C.F.R. Pt. 1630, App. § 1630.2(o). Section 12111(9)(B) "has the effect of making the duty to transfer to another position roughly commensurate with the full class or range of jobs the employee is capable of performing." *DePaoli*, 140 F.3d at 675. However, the ADA only requires an employer to reassign a disabled employee to a position for which the employee is otherwise qualified. *Cochrum*, 102 F.3d at 913. Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers. *DePaoli*, 140 F.3d at 675.

When considering reassignment, "the employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations." *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 677-79 (7th Cir. 1998). *See also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694-95 (7th Cir. 1998). The employer's duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion. *Id. See* 29 C.F.R. § 1630.2(j)(3)(ii)(C); 29 C.F.R. Pt. 1630, App. § 1630.2(o).

RBC contends that transferring Lutter to the warehouse was not a reasonable

accommodation. First, RBC claims that its placement of Lutter in the warehouse was only a light-duty, temporary assignment until Lutter recovered from his injury and was able to return to his permanent position as RTD. Second, RBC argues that there was no vacant position in the warehouse to which Lutter could be assigned. Third, RBC claims that Lutter could not perform the essential functions of the warehouse job.

### a.    Was the Warehouse Position Temporary or Permanent?

If the warehouse job is considered only a temporary position, RBC would have no duty to assign Lutter permanently to that position because the ADA does not require employers to convert temporary light duty assignments into permanent ones. *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 696 (7th Cir. 1998). If warehouseman became Lutter's permanent job, however, then the Court must analyze whether Lutter could perform the essential functions of the warehouse job with or without reasonable accommodation. In *Hendricks-Robinson*, the employer created a distinct pool of light-duty positions for injured employees. *Hendricks-Robinson*, 154 F.3d at 697-98. However, the light-duty positions had no end-date, no specified period for holding the job, and they were not specifically designated as "temporary." *Id.* The employees remained in those jobs until a medical decision concerning the permanence of their disabilities was rendered. *Id.* The Seventh Circuit held that genuine issues of fact remained as to whether the jobs were temporary and whether the injured employees knew that the jobs in which they initially were placed were temporary or whether they could consider the jobs a reasonable accommodation for their impairments. *Id.* Moreover, the court held that "if the job in which an injured employee was placed is in fact a vacant permanent job, . . . and it is suitable for an employee with a disability, then the employee's assignment to that position must be treated as a reassignment to a permanent job for purposes of accommodation. *Id.* (citing

EEOC Enforcement Guidance, 8 FEP Manual at 405:7402 ("In some cases, the only effective reasonable accommodation available for an individual with a disability may be similar or equivalent to a light-duty position. The employer would have to provide that reasonable accommodation unless the employer can demonstrate that doing so would impose an undue hardship."))

In the case at hand, RBC did not have a distinct pool of light duty positions, and Lutter was assigned to the warehouse for over a year. In addition, Lutter has presented evidence that other employees had been permanently transferred to the warehouse job from RTD and other jobs after they requested less physically demanding work, such as Markauskas, Harwood, and Swanson. RBC argues, however, that Rinella and Lutter maintained the goal that Lutter would return to the RTD position through the summer of 1999, and thus it was clear that the warehouse job was temporary until Lutter recovered enough to perform the RTD position. Lutter, however, made clear to Rinella and his doctors by September 1999 that he did not feel he could perform the RTD job. Nevertheless, Lutter remained in the warehouse position through his termination in November 1999.

RBC also contends that he indicated that the warehouse job was a light-duty job in a note he wrote to Lutter on October 6, 1998, where Rinella stated that he "can accommodate light duty that limits lifting / warehouse work." However, Lutter's knowledge that the warehouse job was a "light-duty" job is not sufficient to demonstrate that the job was also temporary. *See Hendricks-Robinson*, 154 F.3d at 697-98. Moreover, RBC paid Lutter according to the warehouseman's scale. Under the applicable collective bargaining agreement, someone who was classified as a route truck driver but was merely performing warehouse duties would have been paid one and one-half times the warehouse scale, indicating that RBC may have reclassified Lutter as a warehouseman. In addition, although Lutter admitted as late as July 1999 that he expected to return to work as an RTD, that same

month Dr. Ross stated that it was doubtful that Lutter would ever be able to return to full duty work with or without surgery. Therefore, the Court finds that there are competing issues of fact as to whether the warehouse job was temporary or permanent.

**b.    Was There A Vacant Position In The Warehouse?**

RBC next claims that there was no vacant position in the warehouse for Lutter to assume at the time Lutter was terminated. *See McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997). Rinella confirmed that there were no openings in the warehouse as of March 1999. An employer is not required to "bump" other employees to create a vacancy, nor is an employer obligated to create a "new" position for a disabled employee. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

Lutter, however, has presented sufficient evidence of a vacancy, without the need to "bump" other employees, to preclude granting summary judgment on this point. Lutter first points to the fact that he worked 40 hours per week at the warehouse for over a year, and he was never without work. In addition, Lutter has presented evidence that there was a vacancy in the warehouse in April 1999 and again in December 1999, right around the time that Lutter was fired. After Bob Harwood requested to be transferred from his RTD position in January 1999 – to obtain a less physically demanding job until he retired – Rinella placed him in the warehouse on April 5, 1999. Harwood continued to work as a warehouse employee until he retired on December 31, 1999. When Harwood retired, Rinella placed Kevin Swanson in the warehouse in early 2000 as his replacement. Swanson had requested less physically demanding work because he was getting older, his knees were getting bad, and he could not stand or go down stairs. In addition, Kruse testified that when Swanson came into the warehouse there was work for him to do, and his placement in the warehouse did not impact

anyone else's work. Swanson continues to work in the warehouse to this date. Thus, Lutter has

presented a genuine issue of material fact as to a vacancy in the warehouse.

### c. Could Lutter Perform The Essential Functions Of The Warehouse Job?

RBC maintains that even if there was a vacant position, Lutter could not perform all the

essential functions of the warehouse position. "The ADA may only require an employer to reassign

a disabled employee to a position for which the employee is otherwise qualified." *Cochrum*, 102

F.3d at 913. RBC argues that Lutter was not qualified for the warehouse position because he could

not perform the essential functions of the warehouse job with or without reasonable accommodation.

The ADA requires "an employer to make whatever accommodations are reasonably possible

in the circumstances to perform the functions essential to his position, including removing

nonessential functions from the job." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 577 (7th Cir.

2001); 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o). However, "reasonable accommodation does

not encompass reallocation of essential job functions," *Cochrum*, 102 F.3d at 913, and the employer

need not accommodate the employee so that he may perform any nonessential function he chooses.

*Hoffman*, 256 F.3d at 577. Thus, the Court must first determine what are the essential functions of

the warehouse job.

To determine whether a job function is essential, courts considers a number of factors,

including "the employer's judgment, written job descriptions, the amount of time spent on the

function, the consequences of not requiring the function, and the work experiences of those

performing the job." 29 C.F.R. § 1630.2; *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001).

Although courts looks to see if the employer actually requires all employees in a particular position

to perform the allegedly essential function, courts avoid second-guessing the employer's judgment. *DePaoli*, 140 F.3d at 674. Functions may be "essential" even if not frequently performed, as long as they serve a valid employer interest. *Doner v. City of Rockford, Il.*, No. 03-1643, 2003 WL 22345473, at *2 (7th Cir. Oct. 8, 2003) (citing *DePaoli*, 140 F.3d at 674; *Basith*, 241 F.3d at 929).

There was no written job description of a warehouse position at the time of Lutter's employment with RBC. Rather, both RBC and Lutter have set forth an extensive list of duties for warehouse employees. While Lutter could perform most of these duties, he could not perform all of them, including: (1) substituting for RTDs; and (2) running drop truck deliveries to small businesses, where he had to manually remove product from the truck, stack it on a pull cart, pull the cart into the establishment, and then unload the product manually. In addition, Lutter had difficulty building and stacking pallets of product and shrink wrapping pallets, and he would only perform these functions on the rare occasion when no one else was available because they involved repetitive lifting and bending. Lutter also had pain while sweeping floors, and he took occasional breaks to manage his pain. Kruse, Lutter's supervisor, also commented that he was not performing the warehouse job satisfactorily, at times calling him lazy or a gimp and accusing him of f***ing off.

RBC in effect argues that the duties Lutter could not perform constitute essential functions of the warehouse job, and Lutter was thus not qualified for the job under the ADA. Lutter, however, contends that these were not essential functions; and that even if they were, he would be able to perform them with reasonable accommodation. First, Lutter argues that substituting for RTDs was not an essential function of the job. Lutter points out that no employee specifically mentioned this function when asked the duties of a warehouseman in their deposition. In addition, Lutter argues that warehousemen rarely substituted for RTDs and that it was thus not an essential function because:

23

(1) during the entire nine months that Harwood worked as a warehouse employee, he substituted for an RTD on exactly four occasions; (2) Markauskas almost never substituted for RTDs; and (3) Kruse on a few occasions ran routes by himself or would maybe run one with a summer helper. As for the other functions Lutter could not perform, Lutter admits that they were frequently performed by warehousemen. Lutter argues, however, that they were not essential because there were so many other functions that Lutter could perform and other warehousemen could perform those functions for him.

RBC counters that, due to its lean operation, it required its warehouse employees to be able to perform all warehouse functions, including backing up RTDs. In addition, Lutter admits that warehousemen worked together to get tasks done, and thus they performed all of the different functions at various times depending on what needed to be done at a particular time. Indeed, functions may be "essential" even if not frequently performed, as long as they serve a valid employer interest. *Doner*, 2003 WL 22345473, at *2 (citing *DePaoli*, 140 F.3d at 674; *Basith*, 241 F.3d at 929). Moreover, showing that not all employees perform at a particular time all the essential job functions also does not make those functions non-essential. *Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001). In *Winfrey*, as in our case, the employer claimed that the employees must be capable of performing all the essential duties of their position even though they were not regularly performed because they may be called upon to perform any of them at any time. *Id.* The Seventh Circuit held that the employer had presented a legitimate business concern that the employees must be able to perform whatever function was needed at any time. *Id.*

The Seventh Circuit has routinely upheld employers' reasonable decisions to require their employees to rotate through different functions and positions, and the court has upheld these as

essential functions. *Watson v. Lithonia Lighting*, 304 F.3d 749, 751 (7th Cir. 2002). "If an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its essential duties." *Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 485 (7th Cir. 1997). In addition, courts consider the employer's judgment as to what functions of a job are essential. 42 U.S.C. § 12111(b)(8). "[A]lthough we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *Basith*, 241 F.3d at 928. Under the Seventh Circuit's interpretation of the ADA, RBC has presented a legitimate business reason for requiring employees to perform each essential job function, including the job of RTD.

In the alternative, Lutter argues that he would have been able to perform the essential functions of the warehouse job with reasonable accommodation. However, the only accommodation Lutter suggests is assigning the functions he cannot do to someone else in the warehouse, and an employer is not required to reallocate essential functions. *Cochrum*, 102 F.3d at 913. *See also Jay v. Internet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (an employer is not required to shuffle job responsibilities amongst employees to create a position to accommodate an employee's disability). Thus, Lutter has failed to produce sufficient evidence to establish a genuine issue of material fact as to his ability to perform the essential functions of the warehouse job with or without reasonable accommodation. As a consequence, Lutter is not a "qualified individual" and thus is not eligible for protection under the ADA.

As a final effort, Lutter claims that RBC should have discussed with Lutter any other positions Lutter may have been able to perform when it terminated Lutter from the warehouse job. Instead, RBC told Lutter he could only come back if he could fulfill the route truck driver duties. An employer, however, is not required to find a third job for an employee. "In order to avoid an infinite regression on the accommodation issue, however, in this context the term ['qualified'] logically cannot include transfer to yet a third job. All such jobs must be considered at the same time, as possible accommodations for the employee whose disability prevents her from performing her first job." *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 677-79 (7th Cir. 1998). Thus, if Lutter could not perform the functions of the warehouse position with or without reasonable accommodation, then contrary to Lutter's arguments, RBC did not have to consider reassignment again as a form of accommodation, and Lutter is not a "qualified individual" and thus is not eligible for protection under the ADA.

## IV. Retaliatory Discharge Claim

Lutter also filed a claim for retaliatory discharge under the Illinois Workers' Compensation Act, 820 ILCS 305/1 *et seq*. ("IWCA"). Lutter claims that RBC fired him in retaliation for Lutter's hiring an attorney and filing a workers' compensation claim under the IWCA.

### A. Jurisdiction

This Court has supplemental jurisdiction over this state law claim under 28 U.S.C. § 1367(a). The Court's original jurisdiction derives from the federal ADA claims that Lutter properly brought before it. Section 1367 states that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case

or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367. The Seventh Circuit has held that this statute codifies the principle that "the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500 (7th Cir. 1999) (citing *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164-65 (1997)). In *Groce*, as in our case, the plaintiff's state law claims arose out of the same set of facts – those regarding his employment and termination from his employer – as his federal claim. Therefore, as in *Groce*, this Court has subject matter jurisdiction under 28 U.S.C. § 1367(a) to decide Lutter's state law claims. *Groce*, 193 F.3d at 500.

Although Section 1367 (c) allows a district court not to assume supplemental jurisdiction over a claim when it has dismissed all claims over which it had original jurisdiction, courts have the discretion to determine whether a state law claim should be resolved because of other considerations like judicial economy, convenience, fairness, and comity. *Horwitz v. Board of Educ. of Avoca School Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001). In *Horwitz*, as in our case, the trial court had resolved the federal issues in the case. However, the Seventh Circuit held that the district court appropriately decided to resolve the plaintiff's state law defamation claim because: (1) neither side contended that the defamation claim did not form part of the same Article III case or controversy as the other federal claims over which the district court did have original jurisdiction; (2) the plaintiff's claim was ripe; (3) Illinois law on the issue (defamation) was well-settled and straightforward; (4) the litigation was over two-years-old; and (4) discovery had been closed. *Id.* These same four

27

prongs apply in the instant case. Therefore, this Court has subject matter jurisdiction over Lutter's state law retaliation claim. *See also, Williams v. Seniff*, 342 F.3d 774, 794 (7th Cir. 2003) (district court properly maintained jurisdiction over state law claim where sending the case to another court would cause a substantial duplication of effort because discovery has been completed, and a transfer to state court would not permit the plaintiff to uncover additional facts to support his claim).

### B.    Did RBC Retaliate Against Lutter?

Lutter's sole evidence of retaliation is that: (1)he was terminated on November 12, 1999, one day after Rinella admits to having a conversation with his workers' compensation attorney regarding the inability to settle Lutter's claim; and (2) Rinella yelled at Lutter when he first found out Lutter had hired an attorney and filed a workers' compensation claim. RBC, however, claims that Lutter's retaliation claim is frivolous because they had a legitimate reason to terminate Lutter: he could not perform the essential functions of RTD or warehouseman.   In addition, for more than 14 months after Lutter's request for workers' compensation benefits, RBC worked with Lutter to attempt to restore him to full employment, and encouraged, rather than discouraged, him to seek workers' compensation benefits. Furthermore, RBC kept Lutter employed during this time.

The IWCA makes it unlawful for an employer to retaliate against employees for exercising their rights or remedies granted by the Act. 820 ILCS 305/4(h). Illinois recognizes an independent cause of action for retaliatory discharge for employees whose employment is terminated as a result of their exercise of rights under the statute, including the right to file a workers' compensation claim. *Borcky v. Maytag Corp.*, 248 F.3d 691, 695-96 (7th Cir. 2001) (citing *Clemons v. Mech. Devices Co.*, 184 Ill.2d 328, 334, 704 N.E.2d 403, 406 (Ill. 1998); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 182, 384 N.E.2d 353, 357 (Ill. 1978)). To recover damages for this tort, "an employee must prove:

(1) that [she] was an employee before the injury; (2) that [she] exercised a right granted by [the Illinois] Workers' Compensation Act; and (3) that [she] was discharged and that the discharge was causally related to [her] filing a claim under the Workers' Compensation Act." *Id. Borcky*, 248 F.3d at 695-96.

The parties agree on the first two prongs of the test for retaliation under Illinois law – Lutter was an employee before the injury, and he filed a workers' compensation claim as allowed by the IWCA. In addition, the Court finds that Lutter was, indeed, discharged. RBC's contention that it terminated Lutter's warehouse position, but not his RTD position (because RBC offered Lutter continued employment provided he could work as an RTD), is without merit as this Court has found Lutter was unable to perform the essential functions of RTD when he was terminated from RBC. The parties, however, disagree as to whether Lutter has presented sufficient evidence such that a reasonable jury could find that Lutter's discharge was causally related to his filing a claim under the Workers' compensation Act.

Although the parties did not address the issue, there is some question whether the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), should apply to state discrimination and retaliation causes of action that are litigated in federal court. *Borcky*, 248 F.3d at 696. The Illinois Supreme Court has held that in retaliatory discharge cases an employer is not required to come forward with an explanation for an employee's discharge. *Clemons*, 184 Ill.2d at 335, 704 N.E.2d at 406. The Illinois Supreme Court held that it remains the plaintiff's burden to prove the elements of the cause of action by a preponderance of the evidence, including a causal connection between the lodging of the complaint and his being fired, as in a traditional tort analysis. *Id*. The Seventh Circuit, however, contrary to its sister circuits, has held

that Illinois retaliatory discharge cases brought in federal court may be analyzed using the burden-shifting method presented in *McDonnell Douglas* because the *McDonnell Douglas* standard is procedural as it regulates merely the order of proof. *Bourbon v. Kmart Corp.*, 223 F.3d 469, 473-74 (7th Cir. 2000) (citing *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58 (7th Cir. 1990)).

In this case, however, as in *Borcky*, the same result would obtain if the Court applies the tort analysis or the *McDonnell Douglas* analysis. Under *McDonnell Douglas*, once a plaintiff establishes a *prima facie* case of discrimination, the defendant has the burden of coming forward with a legitimate, non-discriminatory reason for discharging the plaintiff. *Borcky*, 248 F.3d at 696 (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant meets this burden, the plaintiff must show that the legitimate, non-discriminatory reason asserted by the employer is pretextual. *Borcky*, 248 F.3d at 696 (citing *McDonnell Douglas*, 411 U.S. at 804). Lutter's claim fails under either method because as in *Radke v. Taco Bell*, Lutter failed to establish a *prima facie* case of retaliation under Illinois law, and RBC offered a valid, non-pretextual reason for Lutter's discharge--that Lutter was medically unable to perform the job. *Radke v. Taco Bell Corp.*, No. 02-1924, 2003 WL 1827218, at *3 (7th Cir. Apr. 2, 2003).

Concerning the only disputed element in Lutter's retaliation claim, causation, the ultimate issue to be decided is the employer's motive in discharging the employee. *Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 163, 601 N.E.2d 720 (Ill. 1992). Causation is not established if the basis for the discharge is valid and nonpretextual. *Heldenbrand v. Roadmaster Corp.*, 277 Ill.App.3d 664, 668, 660 N.E.2d 1354, 1357 (Ill. App. 5th Dist. 1996); *Marin v. American Meat Packing Co.*, 204 Ill. App. 3d 302, 307, 562 N.E.2d 282, 285 (Ill. App. 1st Dist. 1990) (The causality element, therefore, requires more than a discharge in connection with filing a claim.) Under Illinois retaliatory discharge

law, an employer may terminate an employee who was medically unable to perform his job. *Id.* RBC has alleged that its valid and non-discriminatory reason for terminating Lutter was that Lutter was medically unable to perform the essential functions of his route truck driving and warehouse duties. Lutter himself admitted that he could not perform the RTD job, and this Court has already found that Lutter could not perform the essential functions of the warehouse job.

Lutter, however, claims that RBC's reason is merely a pretext because the timing of his discharge is sufficient to raise an issue of fact as to RBC's retaliatory motive. First, Lutter claims that when he first told Rinella that he was hiring a workers' compensation attorney in September 1998, Rinella was extremely upset and yelling. However, that was 14 months before Rinella was terminated, and Lutter stated that he and Rinella never discussed the issue again. Second, Lutter claims that one day before Lutter was terminated, Rinella informed RBC's workers' compensation attorney that the union would not cooperate with a settlement that called for payment of pension benefits to Lutter. Rinella thought the attorney said something to the effect of "there was no end in sight for a settlement." Lutter claims that this comment one day before Lutter was terminated shows a causal connection between Lutter's workers' compensation claim and his discharge.

Although timing may be probative of motive under Illinois retaliatory discharge law, the timing of the discharge standing alone is not enough. *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 496-97, 697 N.E.2d 380, 387 (Ill. App. 1st Dist. 1998).[3] Therefore, the fact that

---

[3]Even under the federal law of retaliation, where timing may be enough to prove a causal link, a 14 month period between the protected conduct and the adverse action such as exists in this case would be insufficient to establish a causal connection. Although a "telling temporal sequence" can establish the required nexus between any adverse employment action and the protected expression, "telling" means that the employer's adverse action follows "fairly soon" after the employee's protected conduct. *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998). "One day might do it; so too might one week." *Id.* (internal citations omitted.) The Seventh

Lutter was terminated the day after Rinella had a conversation with his attorney – a full 14 months after Lutter filed his workers' compensation claim (the protected conduct) – is insufficient to prove causation. Likewise, Rinella's alleged anger at Lutter's filing of his claim 14 months before Lutter's termination is insufficient to prove causation where Rinella and Lutter never again discussed the issue. Thus, Lutter has failed to present sufficient evidence in the record to create a genuine issue of material fact regarding the causal connection between Lutter's termination and his workers' compensation claim.

Due to the foregoing, this Court finds no genuine issues of material fact have been raised, and the Court grants summary judgment in favor of RBC on all counts.

IT IS SO ORDERED.

2/4/04

Dated

The Honorable William J. Hibbler

---

Circuit has held that in the absence of any other evidence of a causal link, a four month interval between filing a workers' compensation claim and the retaliatory action is insufficient proof of causation. *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir.1992). *See also Fyfe v. City of Fort Wayne*, 241 F.3d 597, 603 (7th Cir. 2001) (18-month interval in this case is insufficient proof of causation); *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (harassment complaint three months before termination insufficient to establish the causation prong of a prima facie case); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (6 months insufficient).